GEOFFREY A. HANSEN
Acting Federal Public Defender
Northern District of California
JOYCE LEAVITT
Assistant Federal Public Defender
13th Floor Federal Building - Suite 1350N
1301 Clay Street
Oakland, CA 94612
Cellular Telephone:  (415) 517-4879
Email:        Joyce_Leavitt@fd.org


Counsel for Defendant ACOSTA


# IN THE UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA

### OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 20–00275 YGR |
| Plaintiff, | |
| v. | **DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD VARIANCE** |
| RAUL ACOSTA, | |
| Defendant. | **Court:** Courtroom 1, 4th Floor<br>**Date:** August 12, 2021<br>**Time:** 11:30 a.m. |

## INTRODUCTION

Raul Acosta will be sentenced by this Court on August 12, 2021, after having pled guilty to a violation of 18 U.S.C. § 922(g)(1). The offense conduct dates back to October 13, 2019, when Mr. Acosta, was a felon found to be in possession of a firearm. He was initially charged in Alameda County Superior Court with this offense, pled nolo contendere, and was sentenced on December 19, 2019, to 180 days jail plus three years of probation. *See* Revised Presentence Report disclosed July 13, 2021 (PSR) at ¶53. As he sat in jail over the holidays in 2019, Mr. Acosta vowed it would be the last time. At 28 years old, Mr. Acosta recognized that he needed to do better for himself and for his family.

1    Months later, in June, 2020, Mr. Acosta was notified by his parole officer that he had been

2    charged federally for the October 13, 2019, offense to which he had already nolo and completed his

3    sentence in state court, and that a federal arrest warrant was outstanding.[1]

4    Mr. Acosta made his initial appearance in federal court on June 3, 2020, was released by

5    Honorable Magistrate Judge Laurel Beeler on June 10, 2020, and has been out of custody on pretrial

6    supervision since that time. Although Mr. Acosta has undisputedly stumbled while on pretrial

7    supervision, the problems do not reflect an unwillingness to comply or intentional flaunting of

8    supervision, but rather relate to Mr. Acosta's poor executive functioning, mental health issues and

9    years of addiction which have hard-wired his brain in ways that he has been working hard to

10   overcome. Mr. Acosta had struggled with addiction, and cycled in and out of custody, since he was

11   15 years old. The 14 months that Mr. Acosta has been on federal pretrial supervision since his release

12   on June 10, 2020, is the longest uninterrupted period of time that Mr. Acosta has remained out of

13   custody since he was 15 years old.

14   The advisory guideline range in this case is 30-37 months custody. *See* PSR at ¶115. Mr.

15   Acosta asks the Court to allow him to participate in the Alternative to Incarceration Program (ATIP).

16   If Mr. Acosta if not accepted into ATIP or the Court is otherwise not inclined to make that

17   recommendation, Mr. Acosta asks the Court to grant a variance and impose a term of five years

18   probation, which could include home detention and other conditions of supervision. As a condition of

19   probation, Mr. Acosta could also be referred to the Northern District's San Francisco re-entry court

20   program. Magistrate Judge Beeler is one of the judges who oversees the San Francisco re-entry court

21   program and is familiar with Mr. Acosta and his programming needs and unique challenges. Judge

22   Beeler could continue to oversee Mr. Acosta's rehabilitation were he referred to the San Francisco re-

23   entry court. Furthermore, imposing a term of probation would enable the Court to impose five, rather

24   _____

25   [1] The Justice Department's Petite Policy states that defendants prosecuted by the state will not be
     prosecuted federally for crimes arising from the same act unless there exists "a substantial federal
26   interest" which the prior prosecution has left "demonstrably unvindicated" with the approval of an
     assistant attorney general. Although Mr. Acosta has no prior crimes of violence or drug trafficking
27   offenses, extended magazine, sawed-off shot gun or other aggravating factor which would increase
     the base offense level of 14 for Mr. Acosta (being a prohibited person), prosecutors apparently
28   determined that there *was* a "substantial federal interest" left "demonstrably unvindicated," by Mr.
     Acosta's state prosecution, and presumably obtained the necessary waiver to proceed.

DEFENDANT'S SENTENCING MEMO & MOTION FOR DOWNWARD VARIANCE
*ACOSTA*, CR 20–00275 YGR

2

1   than three, years of supervision. It would also avoid unwarranted disparities among similarly situated

2   defendants, many of whom have been sentenced to probation after participating in programming

3   through pretrial services similar to Mr. Acosta.

4       Finally, if the Court is not yet persuaded that Mr. Acosta has the ability to succeed, it could

5   defer sentencing for six to twelve months, schedule Mr. Acosta for updates before the Court

6   regarding his progress, and enable Mr. Acosta to continue to demonstrate his commitment to change.

7       Mr. Acosta files this sentencing memorandum in support of his sentencing request. Attached as

8   exhibits to the sentencing memorandum are (1) letter from Raul Acosta (Exhibit A); (2) letter from

9   Cindy Corea (Exhibit B); (3) letter/text from Adilene Acosta (Exhibit C); (4) text message from Idaly

10  Gutierrez  (Exhibit D); (5) text message from Marcos Acosta (Exhibit E); and (6) pictures of Mr.

11  Acosta with his children (Exhibits F1-3).

12                          **STATEMENT OF FACTS**

13  **A.    Personal Background[2]**

14      Raul Acosta is a 30 year old man who grew up in Oakland, CA after his mother fled Central

15  California in the middle of the night with her four children in tow to escape her abusive husband.

16  PSR at ¶71. Mr. Acosta's father tracked down his wife and children in Oakland, and the abuse

17  continued even though they formally separated. PSR at ¶¶71, 78, 81. As a child, Mr. Acosta

18  witnessed his father repeatedly beat his mother.  On one occasion, Mr. Acosta saw his father drag his

19  mother out of the home where she had been visiting an older son while hitting her repeatedly. *Id*. at

20  ¶81. Mr. Acosta's father and new wife, as well as others, joined in the assault of his mother once she

21  was dragged into the street while Mr. Acosta looked on in horror. *Id*.

22      Mr. Acosta's father also violently assaulted his son "every time I stayed with him." *Id*. at ¶78.

23  He would beat Mr. Acosta with his hands or with a belt repeatedly. *Id*. Often the beatings were so

24  brutal that Mr. Acosta couldn't return home or go to school because of the marks and bruises which

25  were left on his body. *Id*. Mr. Acosta's father also attempted to persuade his son to steal items from

26  stores that his father could then sell for a profit. *Id*. at ¶74. He also neglected Mr. Acosta and his

27  ─────────────────

28  [2]The information in this section is taken not only from PSR, but also from the notes of undersigned
    counsel's meetings with Mr. Acosta, as well as notes from the presentence interview during which
    defense counsel was present.

DEFENDANT'S SENTENCING MEMO & MOTION FOR DOWNWARD VARIANCE
*ACOSTA*, CR 20–00275 YGR

1   siblings, spurning the pleas of Mr. Acosta's mother that he assist her with food and other necessities.

2   *Id*. The family was very poor and struggled financially.

3         In addition, Mr. Acosta was exposed to the violence which pervaded the poverty-stricken

4   neighborhood where he grew up. Mr. Acosta's extended family, including his grandmother, aunts and

5   cousins all lived on the same street. *Id*. at ¶76. Mr. Acosta described the conditions outside his home

6   this way: "people selling drugs, hearing gun shots, people getting shot at . . . was an every day thing .

7   . . either you have a gun or they are using it against you. . . most of my friends ended up going to jail

8   or being killed.[3] When he was 12 years old, Mr. Acosta witnessed his cousin's boyfriend, who was

9   not involved in street life, get shot and killed in front of his aunt's house. *Id*. Mr. Acosta remembers

10  seeing him bleeding and on the ground, and trying to drag himself towards the cousin's house before

11  ultimately bleeding out and succumbing to his gunshot wounds.

12        Being surrounded by violence and death from an early age had a profound effect on Mr.

13  Acosta. Mr. Acosta was traumatized by the memories and continues to struggle with ongoing mental

14  health issues as a result of the trauma and dysfunction, including anxiety, depression and post-

15  traumatic stress disorder (PTSD). *Id.* at ¶¶94, 95.

16        **B.    Drug Use and Treatment**

17        Mr. Acosta turned to alcohol and then drugs, to self-medicate when he was just 12 years old.

18  Mr. Acosta started drinking alcohol when he was 12 years old. PSR ¶99. He tried marijuana at the

19  same age and soon began smoking every day. *Id*. Mr. Acosta used methamphetamine when he was 16

20  years old, and heroin at 19 years of age. *Id*. at ¶100. By the time he was 21 years old, Mr. Acosta was

21  using heroin daily whenever he was out of custody. *Id*. Not until June, 2020, when at the age of 29

22  Mr. Acosta was placed on federal pretrial supervision, was he able to start to address his addiction in

23  earnest. *Id*. Until that point, Mr. Acosta had never successfully participated in either drug or mental

24  health treatment. *Id*. at ¶101.

25        Mr. Acosta did not have the tools to remain drug free when he was first released on federal

26  pretrial supervision and was referred to residential treatment at the Center Point program in Napa,

27

28  _____

[3] The quote is taken from undersigned counsel's notes during the PSR interview.

1   California, after testing dirty for drugs. Mr. Acosta successfully completed Center Point's three

2   month program in November, 2020, which was the first program he'd ever completed. *Id*. At the

3   time, Mr. Acosta also was prescribed Suboxone[4] in addition to counseling. *Id*. at ¶¶100, 103. The

4   Suboxone has been incredibly effective in assisting Mr. Acosta to remain sober, when combined with

5   the other programming put in place by pretrial services.[5]

6       As he reflects on his past, Mr. Acosta recognizes how his addiction negatively impacted his

7   relationships:

8           I regret my mistakes and being blind to being a better father to my kids a
            better son to my mother and better brother to my sisters I lost years out
9           my life being high on drugs

10  Exhibit A. When asked by probation what it could do to help in the future, Mr. Acosta

11  responded "sobriety is the biggest way in which you can help me. I'm around my kids and don't want

12  to show them that."[6]

13      **C.      Offense Conduct and Criminal history**

14      The offense in this case occurred on October 13, 2019. Mr. Acosta was charged in Alameda

15  County Superior Court with being a felon in possession of a firearm and pled nolo contendre to the

16  charge on December, 2019. At that time, Mr. Acosta was sentenced to 180 days custody and three

17  years probation in state court. He will now be sentenced again for the same offense. The offense is

18  not considered to be a crime of violence, nor is there information that Mr. Acosta intended to use the

19  gun to commit violence.

20      Mr. Acosta's base offense level under the federal sentencing guidelines starts at an offense

21  level 14 because he has no prior convictions for crimes of violence or controlled substances (as those

22  terms are defined in the federal guidelines) which would increase the base offense level under the

23

24  _____

25  [4] Suboxone works to block the opioid effect and relieve cravings to use and withdrawal symptoms.
    *See, e.g.* https://www.webmd.com/mental-health/addiction/breaking-an-addiction-to-painkillers-treatment-overview

26  [5] While on pretrial supervision, Mr. Acosta started to struggle after he ran out of his Suboxone
    prescription. PSR at ¶102. Ultimately, Mr. Acosta went to the Cherry Hill Detoxification Center and

27  was put back on Suboxone. PSR at ¶103. In addition, Mr. Acosta was told that he can go to the
    Highland Hospital emergency room to have his suboxone prescription filled at any time so that he

28  will not have to worry about his prescription running out again.
    [6] This quote was in undersigned counsel's notes from the PSR interview.

federal definitions. PSR at ¶¶31-37. His final adjusted offense level following his change of plea is 12. *Id*. at ¶39. Mr. Acosta has prior convictions which place him in Criminal History Category VI. *Id*. at ¶56.

Mr. Acosta's criminal history includes numerous revocations and violations of supervision over the years, which is consistent with an individual who struggles with drug addiction. His prior convictions as well are not insignificant. However, since his arrest for the October 13, 2019, gun possession, Mr. Acosta made the decision that his conduct had to stop, and has taken steps with the assistance of his pretrial services officer to address his addiction and resulting criminal behavior. As a result, the person who will be sentenced by this Court on August 12, 2021, is a very different individual from the person who was arrested two years ago on October 13, 2019 for being in possession of a firearm.

### D.     Post-Offense Rehabilitation

After his arrest on October 13, 2019, Mr. Acosta made the decision to change. Although Mr. Acosta relapsed after his release from custody and was arrested once more on April 4, 2020, with a small baggie containing personal use quantity of drugs (for which he was never charged), PSR at ¶61, Mr. Acosta truly had decided that it was enough. Until then, Mr. Acosta had been transient, homeless and "on the run." Part of Mr. Acosta's motivation to change occurred after a close childhood friend was killed in May 2020. PSR at ¶85. He stated:

> Just recently my friend passed away. He was in programs with me . . . we always talked about getting clean together . . . and I knew him my whole life. They recently killed him on Fruitvale . . . they beat him with a bat and killed him . . . we would sleep in cars together . . . it was me and him. We struggled together. When they killed him it opened my eyes to get sober.[7]

After the death of his friend, Mr. Acosta decided that he was not going to run anymore. After his release, he reached out to the mother of his child, Cindy Correa, who had previously not allowed Mr. Acosta to live with her and her children because of his addiction and criminal behavior. *Id*. at ¶86. When Ms. Correa saw that Mr. Acosta was serious about his desire to change, she agreed to let him come back and live with her.

---

[7] This quote was also taken from undersigned counsel's notes from the probation interview.

DEFENDANT'S SENTENCING MEMO & MOTION FOR DOWNWARD VARIANCE
*ACOSTA*, CR 20–00275 YGR

When he was notified by his parole officer in June, 2020, that he had been charged federally and that a federal arrest warrant had been issued, Mr. Acosta attempted to self-surrender to the police station accompanied by Ms. Corea. However, the police would not take him because of ongoing riots at the time over the George Floyd murder. So Mr. Acosta went home, called his parole officer who contacted the police, and waited at the house until officers came and picked him up to transfer him into custody. Against this backdrop, Magistrate Judge Beeler released Mr. Acosta from custody onto pretrial supervision on June 10, 2020.

The 14 months since his release on federal supervision on June 10, 2020, is the longest period of time that Mr. Acosta has been out of custody since he was 15 years old. It has been difficult. For example, Mr. Acosta was required to attend counseling every other week but couldn't remember which week was counseling and missed sessions. *Id.* at ¶96. As a result, he asked the Court to order that counseling be scheduled every week, rather than every other week. *Id*. at ¶12. Mr. Acosta also asked the magistrate judge to include Courage to Change classes which he now attends weekly. *Id*. Judge Beeler also required Mr. Acosta to write a letter regarding his plan for remembering his schedule and not being late for curfew and referred Mr. Acosta to collaborative courts coordinator, Wyatt, Lim-Temper, who provided Mr. Acosta with suggestions that he has since incorporated into his scheduling and time management. Mr. Acosta is appreciative of Pretrial Services Officer Nelson Barao for pushing him and imposing structure.[8] *See* Exhibit A ("I want to thank Nelson my Pretrial officer for being tuff [sic] on me because if it wasent [sic] for him I wouldn't be where I'm at now")

Mr. Acosta struggles on pretrial supervision are connected to serious executive functioning deficits, perhaps resulting from a childhood filled with adverse childhood experiences, followed by years of chronic drug use. While on pretrial supervision, Mr. Acosta has fully utilized the services

---

[8] The probation officer's PSR sentencing recommendation based upon her determination that Mr. Acosta has a "lack of respect for the law as evident through his repeated violations" of supervision demonstrates a profound misunderstanding of what has actually occurred over the past year. Undersigned counsel urges the Court to meet and confer with Magistrate Judge Beeler, who is involved in the district's re-entry court and attuned to what success looks like for individuals like Mr. Acosta for whom there is not a quick fix, but rather the need for patience and small steps. Magistrate Judge Beeler, who is a neutral arbiter, undoubtedly has a very different perspective of Mr. Acosta after monitoring his pretrial release and meeting with him multiple times in the past year than the probation officer who met Mr. Acosta on just one occasion for approximately an hour, and declined to talk with Judge Beeler before drawing conclusions and making a high end recommendation.

1   provided and followed through on all of Judge Beeler's suggestions. Taking Suboxone has also made

2   a big difference for Mr. Acosta. Since his last stay at Cherry Hill Detoxification Center on July 8,

3   2021, Mr. Acosta has not missed a meeting, an appointment or a drug test and has been able to comly

4   with the many conditions that have been imposed. Mr. Acosta's improvement has not gone

5   unnoticed. For example, the minutes from the last status appearance before Judge Beeler, on July 15,

6   2021, reflect the following: "the Court commends Mr. Acosta for his perfect record since the last

7   court appearance." *See* CR 20-00275 YGR, Dkt. 72. Now, almost four weeks since the last

8   appearance in magistrate court, Mr. Acosta continues to stay on top of his many obligations.

9          Mr. Acosta's significant other has seen the transformation in Mr. Acosta over the past year:

10             Raul is not the person he was before, his change only for the better . . .
               maintaining a job, while fighting his addiction . . . finally taking proper
11             medication to control it. Because he does wanna change. Raul has also
               been taking counseling. Raul has improved more than I can imagine . . .
12             his main focus is having the opportunity to change and show you guys
               that people grow . . . he has a stable job, and doing what a husband and
13             father should do.

14   Exhibit B. In addition, Mr. Acosta's sister, Adilene says this:

15             The decisions he takes now the way he sees things and the plans he has
               for the future has changed dramatically. He now has a job. . . and he
16             even started financially helping my mother take care of our younger
               brother . . . we have had a hard life and I want you to know Raul is
17             working hard every day to be a better person.

18   Exhibit C. *See also* Exhibit D ("I've seen how much he love hes [sic] kids and care for them . .

19   . I've seen a big change in my son . . . it hasn't been easy for him but he is trying"); Exhibit E ("Raul

20   is  . . . really improving himself. I talk to him often . . . going back to jail would be a big step

21   backwards for his progress and his familys well being.")

22          During the probation interview, Mr. Acosta talked about his future, stating "I'm glad I don't

23   need to live that way anymore . . . giving bad examples to my kids. I want my kids to do better. I'm

24   not in the streets . . . now its different." In his letter, Mr. Acosta asks the Court to allow him to

25   continue with his progress:

26             I'm a changed person . . . ever scence [sic] I got clean. . . I'm happy
               showing people that I can succeed with my family by my side . . . hope I
27             get a chance . . . with out them I can't find myself in life

28   Exhibit A.

### III.   DISCUSSION

The Supreme Court's decisions over the last decade have dramatically altered the district court's role at sentencing. *See United States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 552 U.S. 85 (2007); *Gall v. United States*, 552 U.S. 38 (2007). Taken together, these cases make it clear that district court judges now have the ability – as well as the duty – under 18 U.S.C. § 3553 to exercise judgment and discretion in arriving at a sentencing determination. Although "district courts still 'must consult [the] Guidelines and take them into account when sentencing,'" *United States v. Cantrell*, 433 F.3d 1269, 1279 (9th Cir. 2006) (quoting *Booker*, 543 U.S. at 224), they "may not presume that the Guidelines range is reasonable," *Gall*, 552 U.S. at 50 (citing *Rita v. United States*, 551 U.S. 338 (2007)). Furthermore, the guideline range may not be weighed more heavily than any other statutory factor. *Gall*, 552 U.S. at 50; *Carty*, 520 F.3d at 991.

The Court must consider the Guidelines range, the nature and circumstances of the offense, the history and characteristics of the defendant and the need to avoid unwarranted sentence disparities among similarly situated defendants. 18 USC § 3553(a)(1), (a)(4) and (a)(6). In this case, a referral to ATIP or a sentence of probation is "sufficient but not greater than necessary," to comply with the purposes of 18 USC § 3553(a). Some of these factors are discussed below

### A.   Mr. Acosta's History and Characteristics Warrant a Downward Variance

Under 18 U.S.C. § 3553(a), Mr. Acosta's history and characteristics should be considered. "Evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California v. Brown*, 479 U.S. 538, 545 (1987)(O'Connor, concurring).[9]

Scientists have increasingly observed connections between childhood trauma like Mr. Acosta's and neurological deficits. There is a growing body of peer-reviewed studies linking Adverse

---

[9] The guidelines also recognize diminished capacity as a mitigating factor and authorize a downward departure when someone commits an offense while suffering from significantly reduced mental capacity. *See, e.g.* USSG § 5K2.13, *United States v. Cantu*, 12 F.3d 1506, 152, 1516 (9th Cir. 1993) ("The goal . . . is lenity towards defendants whose ability to make reasoned decisions is impaired"); *United States v. Lewinson*, 988 F.2d 1005 (9th Cir. 1993) (four level departure based on depression).

Childhood Experiences (ACEs) with long-term changes in the brain. Anda, Felitti, et. Al. *The enduring effects of abuse and related adverse experiences in childhood: A convergence of evidence from neurobiology and epidemiology*, Eur. Arch. Psychiatry Clin. Neurosci. 2006 April; 256(3) 174-186[10] (concluding that "the graded relationship of the ACE score to 18 different outcomes[11] in multiple domains theoretically parallels the cumulative exposure of the developing brain to the stress response with resulting impairment in multiple brain structures and functions.") Moreover, an article in *The Atlantic* discussed this research, noting the pioneering work of physicians Anda and Felitti cited above:

> Unpredictable childhood trauma has long-lasting effects on the brain. Studies have shown that people with adverse childhood experiences are more likely to suffer from mental-and physical health disorders, leading people to experience a chronic state of high stress reactivity. One study found that children exposed to ongoing stress released a hormone that actually shrank the size of the hippocampus, an area of the brain that processes memory, emotion, and stress management . . . 'Chronic, unpredictable stress is toxic when there is no reliable adult,' said Donna Jackson Nakazawa, the author of Childhood Disrupted and a science journalist who focuses on the intersection of neuroscience and immunology.

Cindy Lamonthe, *When Kids Have to Act Like Parents, It Affects Them for Life*, The Atlantic, October 26, 2017.[12] Mr. Acosta clearly suffered a number of ACE's, including physical abuse, domestic violence, divorce, community violence and poverty. He is finally learning to manage his anxiety, depression and PTSD through mental health and drug counseling, cognitive behavioral therapy, and other tools provided by pretrial services.

Mr. Acosta's drug addiction is intertwined with his adverse childhood experiences and resulting mental health issues which he attempted to self-medicate, primarily through heroin. PSR at ¶¶78-79. As a result, his decision making was impaired at the time of the offense.

Unless or until it is treated, childhood trauma will continue to affect decision making later in life:

> [I]n a justice system built upon the idea of choice and personal responsibility, experts say the path to trouble may begin long before an individual has any say in the matter. What happens to people in childhood can make a difference in whether they end up in a

---

[10] Available at https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3232061/
[11] These 18 areas were subcategories of the following: Mental Disturbances, Somatic Disturbances, Substance Abuse, Impaired Memory of Childhood, Sexuality, and Perceived Stress.
[12] Available at https://www.theatlantic.com/family/archive/2017/10/when-kids-have-to-parent-their-siblings-it-affects-them-for-life/543975/

prison cell, or whether they are even wired to make rational decisions.

Burch, Audra, *A Gun to His Head as a Child, In Prison as an Adult*, NEW YORK TIMES (October 15, 2017). It is often repeated by courts that childhood trauma is not an excuse for an adult's behavior with courts arguing that a grown person has plenty of time to decide what type of adult he should be. However, childhood trauma does not have an expiration date. Indeed, it is a major factor "that shapes . . . criminal behavior in adulthood." *Id*. It is a "huge factor within the criminal justice system."

Treating drug addiction with counseling and cognitive behavior therapy in lieu of custody is a recognized alternative. Chemical dependency must be addressed like any other chronic illness, according to the National Institute on Drug Abuse:

> Treatment enables people to counteract addiction's powerful disruptive effects on the brain and behavior and to regain control of their lives.

*How Effective is drug addiction treatment? Principles of Drug Addiction Treatment: A Research Based Guide* (Third Edition), National Institute on Drug Abuse.[13] Treatment of the trauma and drug addiction, in lieu of imprisonment, has been demonstrated to reap far more effective results in reducing recidivism.

Mr. Acosta has benefitted tremendously from the programming offered by pretrial services. Mr. Acosta also recognizes the changes in himself. Exhibit A.  Continuing drug treatment, along with the mental health issues should remain the priority. Allowing Mr. Acosta to participate in ATIP, or granting a variance and imposing a sentence of probation, or deferring sentence to allow Mr. Acosta to demonstrate that he is still working towards rehabilitation, are all appropriate alternatives which address the need for programming and treatment over custody.

## B.    A Sentence of Probation or Community Confinement is Sufficient in Light of Mr. Acosta's Rehabilitative Progress and Post offense Rehabilitation

This Court can consider "post-crime maturation and self-rehabilitation" at sentencing. *See United State v. Ruff*, 535 F.3d 999, 1003 (9th Cir. 2008). The Supreme Court has "made clear that post-sentence or post-offense rehabilitation – particularly in light of its tendency to reveal a

---

[13] Available at https://www.drugabuse.gov/publications/principles-drug-addiction-treatment-research-based-guide-third-edition/frequently-asked-questions/how-effective-drug-addiction-treatment

1  defendant's likelihood of future criminal conduct – [is] a critical factor to consider in the imposition

2  of a sentence." *United States v. Trujillo*, 713 F.3d 1003, 1010 (9th Cir. 2013)(citing *Pepper v. United*

3  *States*, 562 U.S. 476, 491-93 (2001) and *Gall*, 552 U.S. at 59 (emphasis added). Such rehabilitation is

4  "the most up-to-date picture" of a defendant's history and characteristics, which in turn sheds light on

5  whether a defendant will be deterred from committing another crime. *Pepper*, 562 U.S. at 492

6  (quoting 18 U.S.C. § 3553(a)(1)).

7       In this case, Mr. Acosta has worked hard to utilize the opportunities offered to him to be

8  successful. Moreover, those closest to Mr. Acosta have written about the changes they have observed.

9  *See, e.g.*, Exhibit B ("Raul [is]  . . . finally taking proper medication . . . also been taking counseling.

10  Raul has improved more than I can imagine."); Exhibit C ("the way he sees things and the plans he

11  has for the future has changed dramatically."); Exhibit D ("I've seen a big change in my son");

12  Exhibit E ("he is really improving himself."). Mr. Acosta has been working full time while attending

13  weekly mental health counseling, weekly Courage to Change classes, drug testing, and abiding by a

14  curfew. He also has been in touch with his pretrial services officer to whom he is very grateful.

15       Pretrial services has given Mr. Acosta the tools to be successful and the changes that he has

16  made are significant. But Mr. Acosta is still a work in progress. He needs additional structure and

17  supervision as he continues to move forward. However, Mr. Acosta's post-offense rehabilitation

18  warrants referral to ATIP, which is the ideal medium by which he could continue his rehabilitation,

19  or imposition of five years probation with a re-entry court component. Should the Court require

20  additional data before making a sentencing decision, it could defer sentencing for 6 to 12 months to

21  allow Mr. Acosta to continue to demonstrate his commitment to change.

22       **C.     Nature and Circumstances of the Offense**

23       Mr. Acosta pled guilty to being a felon in possession of a firearm. It is not a crime of violence

24  and Mr. Acosta did not possess the firearm to commit any crimes of violence. Mr. Acosta is aware

25  that he cannot, under any circumstances, continue to possess a firearm ever again. In addition, Mr.

26  Acosta has already been sentenced for his possession of the firearm on October 13, 2019, and should

27  not be subjected to a successive custodial sentence.

28       Mr. Acosta appreciates being given the opportunity to participate in federal supervision. The

1  federal prosecution has presented a silver lining which likely has saved Mr. Acosta's life. Although

2  he had already decided to change his life prior to the filing of the federal case, it is unclear how

3  successful Mr. Acosta would have been without the robust programming and hands-on assistance

4  which he received from federal pretrial services and the courts. Mr. Acosta is truly grateful.

5       Based upon the nature and circumstances of the offense, Mr. Acosta's requested sentence of

6  referral to ATIP or a variance and imposition of five years probation is appropriate.

7       **D.     The Need to Avoid Unwarranted Disparity**

8       In fashioning an appropriate sentence in this case, the Court must avoid unwarranted sentencing

9  disparities among defendants with similar records who have been found guilty of similar conduct. 18

10  USC § 3553(a)(6). *See also United States v. Amezcua-Vasquez*, 567 F.3d 1050, 1055 (9th Cir. 2009).

11  The need to avoid unwarranted disparity is something that the courts look to in determining what is

12  appropriate. In this case, Mr. Acosta pled guilty to being a felon in possession of a firearm. In

13  determining an appropriate sentence, the Court may compare him with similarly situated defendants.

14       A sentence of five years probation would avoid unwarranted sentencing disparities.  Other

15  defendants in the district convicted of being a felon in possession of a firearm—including some

16  defendants facing higher advisory Sentencing Guideline ranges—have received probationary

17  sentences after participating in pretrial programming similar to that in which Mr. Acosta has been

18  participating. Some of the similarly situated cases are set out in the table below:

19

20

| Client Initials | Case No. | Charge(s) | USSG Range | Sentence | Pretrial Custody |
|---|---|---|---|---|---|
| L.A | 19-0078 (JST) | Felon in possession | 37-46 | 5 years probation plus 6 months home detention after deferring sentence for 1 year | 3 days |
| D.G. | 17-20-CRB | Felon in possession | 46-57 | Time served after sentencing deferred for a year | 1 day |
| J.B. | 19-258 PJH | Felon in possession | 33-41 | 5 years probation | 7 days |
| O.C. | 15-438-RS | Felon in possession | 30-37 | 5 years probation | 14 days |
| A.C. | 16-511-VC | Felon in possession (2 counts) | 168-210 | 5 years probation | 6 days |
| S.E. | 14-43-JST | Felon in possession | 37-46 | 5 years probation | 1 month |
| A.M. | 18-416 JD | Felon in possession | 37-46 | Time served after sentencing deferred 6 months | 3 weeks |
| R.S. | 17-256 JD | Felon in possession | 30-37 | Time served after sentencing deferred for a year | 3 days |

A sentence of five years probation also means that Mr. Acosta would still face the advisory guideline range of 30-37 months and up to ten years imprisonment should he violate his probation during that five year period. A non-custodial sentence in this case would avoid unwarranted disparities between Mr. Acosta and other defendants similarly situated.

### E.   Obtaining Treatment in the Most Effective Manner

"The underlying purposes of sentencing include not only punishment and deterrence, but also the provision of treatment to a defendant in need of it." *United States v. Bad Marriage*, 392 F.3d 1103, 1114 (9th Cir. 2004) (citing 18 U.S.C. § 3553(a)(2)(D)).  Furthermore, "Congress intended supervised release to assist individuals in their transition to community life. Supervised release fulfills rehabilitative ends, distinct from those served by incarceration." *United States v. Johnson*, 529 U.S. 53, 59 (2000) (citing 18 U.S.C. § 3553(a)(2)(D)).  A sentence of five years of probation will allow Mr. Acosta to continue to obtain treatment as he has out of custody. Mr. Acosta is an excellent candidate for the re-entry court program, as well as other programming recommended by his probation officer. No additional time in custody at this time is warranted and allowing Mr. Acosta to remain out of custody will enable him to obtain treatment in the most effective manner.

**CONCLUSION**

For the reasons described above, Mr. Acosta respectfully requests that the court either refer him to ATIP, or grant a variance and impose a sentence of five years probation, with whatever conditions the Court deems to be necessary or helpful. Should the Court determine that additional information would be helpful, Mr. Acosta asks the Court to defer sentencing for 6 to 12 months, in order to enable Mr. Acosta to continue programming and demonstrate his commitment and ability to change.

Dated:    August 5, 2021                    Respectfully submitted,

GEOFFREY A. HANSEN
Acting Federal Public Defender

/S
JOYCE LEAVITT
Assistant Federal Public Defender